J-S21002-21

2021 PA Super 246

| | | |
|---|---|---|
| LORI ANN RYAN | : | IN THE SUPERIOR COURT OF |
| | : | PENNSYLVANIA |
| | : | |
| v. | : | |
| | : | |
| | : | |
| LOUIS FELICETTA RUIZE | : | |
| | : | |
| Appellant | : | No. 46 EDA 2021 |

Appeal from the Order Entered November 25, 2020
In the Court of Common Pleas of Northampton County Civil Division at
No(s): No. C-48-PF-2019-00855

BEFORE: BOWES, J., OLSON, J., and COLINS, J.[*]

OPINION BY BOWES, J.: **FILED DECEMBER 14, 2021**

Louis Felicetta Ruize appeals from the November 25, 2020 protection from abuse ("PFA") order, prohibiting contact with Lori Ann Ryan, his former wife, and harassment of Ryan's two daughters,[1] for three years. We affirm.

This case arises out of two incidents surrounding the dissolution of Ruize and Ryan's marriage. The first incident occurred in May 2019, when Ruize held a loaded gun to his head and threatened to shoot himself if Ryan left. The second incident occurred in September 2019, when the couple's therapist, Bernadette Gaumer, called Ryan to notify her that during Ruize's counseling session that day, he stated several times that if he killed Ryan in their home with a firearm, it could look like an accident. Based on that phone call, Ryan immediately filed an emergency PFA petition, which was granted. On

_____

[*] Retired Senior Judge assigned to the Superior Court.

[1] Ruize is the father of Ryan's younger daughter.

September 30, 2019, Ryan filed a PFA petition, and the trial court granted a temporary PFA order. Thereafter, the trial court issued an order extending the temporary PFA order until October 11, 2020, and continued the final PFA hearing.

In anticipation of the final hearing, Ryan sought permission to call Gaumer as a witness to testify about Ruize's statements during his therapy session. The trial court again continued the hearing to allow Ryan and Ruize to "file briefs regarding the propriety of expert testimony[.]" Order of Court, 10/28/20. In Ruize's brief, he stated that he "suspected that [Gaumer] would be used as an expert witness in the matter to put forth evidence that [Ryan] is afraid of [Ruize] and the effect the alleged incident has had on [Ryan's] state of mind." Letter Brief, 11/2/21, at 1. Ruize argued that such testimony was not proper in a final PFA hearing. *Id*. at 2. In Ryan's brief, she argued that she intended to call Gaumer as a fact witness, not an expert witness, and that Ruize's statement to Gaumer during his therapy session did not qualify as a privileged communication under 42 Pa.C.S. § 5944 because the statement constituted a credible threat to seriously harm another. *See* Brief in Support of Testimony of Bernadette Gaumer, MSCW, 11/3/20, at unnumbered 1-5.

The trial court, which did not receive Ruize's brief, granted permission for Gaumer to testify at the hearing. During Gaumer's testimony, Ruize claimed privilege as to his statement to Gaumer during his counseling session that prompted disclosure to Ryan. Since the trial court found that the privilege

had already been waived because Gaumer, out of concern for Ryan's safety, had notified Ryan of the statement, it held that Gaumer could testify to what she had previously relayed to Ryan.

Gaumer testified that she is a self-employed licensed clinical social worker[2] who works through an organization called A Pathway to Healing Counseling Services, LLC. In 2019, she met with Ruize and Ryan, both

_____

[2] A clinical social worker is defined by the American Board of Examiners in Clinical Social Work in pertinent part as follows:

> Clinical social work is a healthcare profession based on theories and methods of prevention and treatment in providing mental-health/healthcare services, with special focus on behavioral and bio-psychosocial problems and disorders. Clinical social work's unique attributes include use of the person-in-environment perspective, respect for the primacy of client rights, and strong therapeutic alliance between client and practitioner. With 250,000 practitioners serving millions of client consumers, clinical social workers constitute the largest group of mental-health/healthcare providers in the nation.
>
> The knowledge base of clinical social work includes theories of biological, psychological, and social development; diversity and cultural competency; interpersonal relationships; family and group dynamics; mental disorders; addictions; impacts of illness, trauma, or injury; and the effects of the physical, social, and cultural environment. This knowledge is inculcated in social work graduate school and is fused with direct-practice skills that are developed by the practitioner during a period of at least two years of post-graduate experience under clinical supervision. This period should suffice to prepare the clinical social worker for autonomous practice and state-licensure as a clinical social work professional. In the years that follow, clinical social workers may pursue an advanced-generalist practice or may decide to specialize in one or more areas.

https://abecsw.org/clinical-social-work/clinical-social-work-described/

separately and together, for marriage and divorce counseling. On September 27, 2019, she had a private therapy session with Ruize. During that session, he stated several times that he could kill Ryan in their home and it would not be a problem for him because there was a variety of reasons as to why it would look like an accident. These statements concerned Gaumer, and based on her duty to warn, she called Ryan to advise her of the statements.

Specifically, on direct examination, Gaumer testified as follows:

A.      I told Ms. Ryan that her husband cited several ways that he could accidentally kill her in their home by firearm.

Q.      Anything else?

A.      That was the synopsis of it. He had noted several different ways that if he were to shoot her in his home, then it would be really a non-issue because he could have done it accidentally, or he could have thought that she was a robber or he could think he was under attack. So those things concerned me and I thought I needed to disclose that.

Q.      Were you aware of whether Mr. Ruize owned any guns that he had in the residence?

A.      I know that Mr. Ruize had a gun in the residence, and I believe that -- I thought there was still a weapon in the home.

Q.      Did you indicate anything to Ms. Ryan about how you evaluated those statements?

A.      Well, I did not, no. I did not go into that. The reason for my heightened alarm was because it had been noted at least three different times of how he could accidentally shoot her in their home. That was during the course of our session.

Q.      Did you say anything further to Ms. Ryan about Mr. Ruize's statements?

        A.      No.

N.T., 11/10/20, at 10-11.

        Ryan testified that in May 2019, while she and Ruize were living together, the two got into an argument and she asked him to leave. Instead of leaving, Ruize went into their bedroom and closed the door. When he did not reemerge, Ryan entered the bedroom to find him pressing a loaded gun to his head and threatening to kill himself if she left. Ryan further testified that after Gaumer relayed what Ruize had said during his therapy session, she immediately called 911 and began pursuing a PFA order. Ryan testified that she was afraid of Ruize when she initially sought the PFA order and remained afraid of him at the time of the hearing.

        Ruize testified that he did not point a firearm at his head in May 2019. As to the statements he made to Gaumer during his therapy session, he testified that they were largely taken out of context. He maintained that he never made a statement that a shooting could look like an accident. Rather, he claimed that he responded to Gaumer's repeated hypothetical questions of what he would do if Ryan broke into their home, by stating that if she broke in, he would call 911, but if she attacked him, he would use deadly force, which he believed he was authorized to do.

        The trial court accepted the testimony of Gaumer as credible and granted a final PFA order that would remain in effect until November 10, 2023. Ruize filed a motion for reconsideration, asking the trial court to (1) find Gaumer incompetent to testify; (2) modify the final PFA order's duration to

two years; (3) strike the parties' child as a protected party; and (4) strike the provision excluding Ruize from his residence in Mount Bethel, Pennsylvania. A hearing was held on November 25, 2020, at the conclusion of which the trial court granted Ruize's request to strike the provision excluding him from his residence and otherwise denying the motion.[3]  This timely appeal followed. Both Ruize and the trial court complied with the mandates of Pa.R.A.P. 1925.

Ruize raises the following issue for our review: "Whether the Trial Court erred when it permitted [Ruize's] 'licensed clinical social worker' to testify over Counsel's objection?"  Ruize's brief at 2.

"Our standard of review for PFA orders is well settled.  In the context of a PFA order, we review the trial court's legal conclusions for an error of law or abuse of discretion."  **E.K. v. J.R.A.**, 237 A.3d 509, 519 (Pa.Super. 2020) (citations and quotation marks omitted).  Our review focuses on the psychiatrist-patient privilege, which "is codified [at 42 Pa.C.S. § 5944]; the interpretation of a statute is a question of law, resulting in a standard of review that is *de novo* and a scope of review that is plenary."  **Farrell v. Regola**, 150 A.3d 87, 96 (Pa.Super. 2016) (citation omitted).

The § 5944 privilege provides as follows:

> No psychiatrist or person who has been licensed under the act of March 23, 1972 (P.L. 136, No. 52), to practice psychology shall

---

[3] The trial court did not strike Ruize's daughter as a protected party because she was not listed as such in the PFA order.  Rather, the prohibition relating to her only involved harassment, not contact.  Since the PFA order explicitly kept the existing Northampton County custody order in place, we note that it did not alter any child custody arrangements.

be, without the written consent of his client, examined in any civil or criminal matter as to any information acquired in the course of his professional services in behalf of such client. The confidential relations and communications between a psychologist or psychiatrist and his client shall be on the same basis as those provided or prescribed by law between an attorney and client.

42 Pa.C.S. § 5944 (footnote omitted). "This privilege 'is designed to protect confidential communications made and information given by the client to the psychotherapist in the course of treatment,' but does not 'protect the psychotherapist's own opinion, observations, diagnosis, or treatment alternatives[.]'" **Farrell**, **supra** at 97–98 (quoting **Commonwealth v. Simmons**, 719 A.2d 336, 341 (Pa.Super. 1998).

Here, Gaumer's testimony was limited to statements made by Ruize during his therapy session that prompted disclosure to Ryan under Gaumer's duty to warn. Such statements fall squarely within the parameters of this privilege so long as the privilege applies to Gaumer. In its Rule 1925(a) opinion, the trial court found the privilege did not apply because Gaumer is a licensed clinical social worker, not a psychiatrist or licensed psychologist. Trial Court Opinion, 2/16/21, at 7. As such, the trial court concluded that the privilege applicable to her was found at 42 Pa.C.S. § 5948, titled "Confidential communications to qualified professionals," which provides as follows:

Communications of a confidential character made by a spouse to a qualified professional as defined in 23 Pa.C.S. § 3103 (relating to definitions)[4] shall be privileged and inadmissible in evidence

---

[4] Section 3103 defines "qualified professionals" as "[i]nclud[ing] marriage counselors, psychologists, psychiatrists, social workers, ministers, priests,
*(Footnote Continued Next Page)*

> in any matter under 23 Pa.C.S. Pt. IV (relating to divorce) or VI (relating to children and minors) unless the party concerned waives this privilege.

42 Pa.C.S. § 5948. Since Gaumer testified at a PFA hearing, which falls under Part VII of the statute, not Parts IV or VI, the trial court found that this privilege, while applicable to Gaumer as a licensed clinical social worker, did not prevent her from being able to testify to Ruize's statements. Trial Court Opinion, 2/16/21, at 8.

Ruize disagrees, insisting that pursuant to **Farrell**, **supra**, § 5944 applies to Gaumer because "it is reasonable to infer from [Gaumer's testimony] that [she] is part of [a] treatment team at a Pathway to Healing Counseling Services, LLC." Ruize's brief at 9. As to the trial court's application of § 5948, Ruize argues that the privilege listed in § 5948 is limited to proceedings under Parts IV and VI, and that otherwise § 5944 applies. According to Ruize, because § 5948 includes psychologists and psychiatrists within the definition of qualified professionals, the trial court's interpretation causes conflict between § 5944 and § 5948. *Id*. at 10-11. While Ruize acknowledges that Gaumer "was free to break privilege to warn of what she deemed a credible threat to a specific individual, . . . the plain language of 42 Pa.C.S.A. § 5944 rendered her an incompetent witness and no precedent exists to contravene against the plain language of the statute." *Id*. at 15.

_____

rabbis or other persons who, by virtue of their training and experience, are able to provide counseling." 23 Pa.C.S. § 3103.

Ruize relies on this Court's decision in **Farrell**, **supra**, where we applied the § 5944 privilege to a licensed clinical social worker in the limited circumstance where the social worker provided care as part of a mental health care team that included a licensed psychologist. In that case, the Regolas appealed a discovery order that compelled *in camera* review of, *inter alia*, counseling records, which they contended were protected by the § 5944 privilege. Of particular import was whether the parameters of § 5944 applied to counseling sessions Mrs. Regola had with a licensed clinical social worker who provided a portion of her mental health care. **Farrell**, **supra** at 99. This Court found that the records were privileged, despite her counselor's title, because he worked as a member of a treatment team, which included a licensed psychologist, and because the counseling that the licensed clinical social worker provided was performed in the capacity as a member of that team. **Id**. at 101.

In so concluding, this Court relied on **Simmons**, **supra**, wherein this Court analogized § 5944 to the attorney-client privilege, finding that the counselor's title was not dispositive of whether the communication was privileged.

> As set out *supra,* the § 5944 privilege sets forth that "The confidential relations and communications between a psychologist and his client shall be on the same basis as those provided or prescribed by law between an attorney and a client." In determining whether a communication by a client to someone other than his attorney is covered by the attorney-client privilege, courts have held that as long as the recipient of the information is an agent of the attorney and the statement is made in confidence

for the purpose of facilitating legal advice, it is privileged. In the attorney-client context, the job description of the recipient of a confidential communication or their lack of legal training is irrelevant so long as the recipient is an agent of an attorney and the statement is made in confidence for the purpose of obtaining or facilitating legal advice. We find that this reasoning should apply with equal force to members of the Mentor treatment team in conversations with T.W. in the course of facilitating the treatment plan.

*Id*. at 343 (citations omitted). Therefore, this Court held that "any oral communication made by T.W.[, the patient,] in private to **any** member of the treatment team[, including social workers,] and used by the team for the purpose of psychotherapeutic evaluation is privileged" under Section 5944. *Id*. (emphasis in original).

Instantly, Gaumer never testified that she provided care to Ruize as part of a treatment team that included a psychiatrist or licensed psychologist. Rather, she testified that she was self-employed and that she provided divorce and marriage counseling with Ruize and Ryan together, and also saw them separately for other issues. While she testified that she works through an organization called A Pathway to Healing Counseling Services, LLC, the certified record does not indicate whether that organization is a fair analogue to the "treatment team" discussed in *Farrell* or is merely a shared office space. More importantly, assuming that the organization can operate as a team, there is no record testimony that it actually utilized such an approach for Ruize. In light of the certified record, we simply cannot follow Ruize's leap that, because Gaumer, a self-employed licensed clinical social worker, belonged to a counseling organization, her services to Ruize must have been

part of a treatment team that included a psychiatrist or licensed psychologist. As such, **Farrell** and **Simmons** do not provide support for finding that Gaumer is subject to the § 5944 privilege.

We also note that this Court has not yet extended the § 5944 privilege to a licensed clinical social worker working independently, and we decline to do so now based upon the record before us.

> It is well established that, as a general rule, Pennsylvania law does not favor evidentiary privileges. As a result, courts should accept testimonial privileges only to the very limited extent that permitting a refusal to testify or excluding relevant evidence has a public good transcending the normally predominant principle of utilizing all rational means for ascertaining the truth.

**In re L.F.**, 995 A.2d 356, 360 (Pa.Super. 2010) (citations and quotation marks omitted). In **In re L.F.**, this Court raised but did not reach the question of whether the § 5944 privilege applies to a licensed clinical social worker operating alone because it found that the social worker did not reveal any confidential communications. Nonetheless, we noted that in **Simmons**,

> [t]his Court held that the psychotherapist/patient privilege applied to social workers in the limited situation where the social worker works as an agent under the direct supervision of a licensed psychiatrist/psychologist who approves the patient's individual treatment plan and had close contact with the social worker to discuss the patient's progress and goals. In the case *sub judice,* there is no indication from the record that Ms. Schroeder's treatment of Mother was supervised by a psychiatrist or psychologist or that Schroeder was a part of mental health care team.

**Id** at 360 n.7 (citation omitted).

As in **Simmons**, there is no indication from the certified record that Gaumer's treatment was supervised by a psychiatrist or licensed psychologist, or that she was part of a mental health care team that included a psychiatrist or licensed psychologist. By its plain terms, § 5944 simply does not apply to Gaumer as she is neither a psychiatrist or licensed psychologist.

We are likewise unconvinced by Ruize's argument that conflict exists between § 5944 and § 5948. Section 5944 "'is designed to protect confidential communications made and information given by the client to the psychotherapist in the course of treatment[.]'" **Farrell**, **supra** at 97-98 (quoting **Simmons**, **supra** at 341). Section 5948, on the other hand, is designed to protect confidential communications given by a spouse to qualified professionals, which includes, *inter alia*, psychiatrists and licensed psychologists, in the context of proceedings related to divorce or children and minors. Ruize is correct that both sections protect confidential communications made to psychiatrists and licensed psychologists. However, § 5944 creates a general privilege that applies to confidential client communications made to psychiatrists and licensed psychologists in civil and criminal matters, while § 5948 applies to confidential client communications made by a spouse to a broader category of qualified professionals in specific divorce and child custody matters. As such, we discern no conflict between the two sections.

Finally, we agree with the trial court that although § 5948 protects confidential communications made by Ruize to Gaumer, it does not do so in PFA proceedings. Since the § 5944 privilege does not apply to Gaumer, the trial court did not err when it permitted Gaumer to testify to Ruize's statements that prompted her disclosure to Ryan. Accordingly, we affirm the final PFA order.

Order affirmed.

Judgment Entered.

Joseph D. Seletyn, Esq.
Prothonotary

Date: 12/14/2021